UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Ronald Gaines, | |
| *Plaintiff,* | No. 21 CV 5192 |
| v. | Judge Lindsay C. Jenkins |
| Thomas J. Dart, *et al.,* | |
| *Defendants.* | |

**MEMORANDUM OPINION AND ORDER**

Ronald Gaines ("Gaines"), a former Cook County Sheriff's Office employee, brings this action against Defendants Carmen Ruffin ("Ruffin") in her individual capacity, and Sheriff Thomas J. Dart ("Sheriff Dart") in his official capacity as Sheriff of Cook County (collectively, "Defendants"). In the operative complaint, Gaines alleges that Defendants discriminated against him on the basis of age in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), the Illinois Human Rights Act, 775 ILCS 5/2-102 ("IHRA"), and the Fourteenth Amendment's Equal Protection Clause, via 42 U.S.C. § 1983. [Dkt. 20 at 9–17.][1] Gaines also seeks indemnification against Cook County. [*Id.* at 17–18.]

Before the Court is Defendants' motion for summary judgment. [Dkt. 108.] For the reasons stated below, the motion is granted.

---

[1] Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

1

## I.    Local Rule 56.1

"On summary judgment, the Court limits its analysis of the facts to the evidence that is presented in the parties' Local Rule 56.1 statements." *Kirsch v. Brightstar Corp.*, 78 F. Supp. 3d 676, 697 (N.D. Ill. 2015). The statements serve a valuable purpose: they help the Court in "organizing the evidence and identifying disputed facts." *Fed. Trade Comm'n v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). "To dispute an asserted fact, a party must cite specific evidentiary material that controverts the fact and must concisely explain how the cited material controverts the asserted fact. Asserted facts may be deemed admitted if not controverted with specific citations to evidentiary material." N.D. Ill. L.R. 56.1(e)(3).

A party responding to an adversary's statement of fact may make objections based on admissibility, with the argument for the propriety of the objection in its brief. N.D. Ill. L.R. 56.1(e)(2) ("If a party contends that its opponent has included objectionable or immaterial evidence or argument in a L.R. 56.1 submission, the party's argument that the offending material should not be considered should be included in its response or reply brief."). If the Court overrules the objection and the party does not otherwise dispute the fact, however, the fact is deemed admitted. *Id.*

Defendants contend that many of Gaines's Local Rule 56.1(b)(2) responses to the statement of facts are deficient in one way or another. [Dkt. 132 at 5.] For example, several of Gaines's responses fail to admit or deny the asserted fact, contain objections to a paragraph as a whole, or recite allegations contained in the Second Amended Complaint. [*See, e.g.*, Dkt. 117, ¶¶6–12, 41–44, 47–49, 53–69.] Gaines also includes legal argument throughout his submission despite Local Rule 56.1(d)(4).

2

Regarding Gaines's Local Rule 56.1(b)(3) statement of additional facts, Defendants argue Gaines mischaracterizes the cited evidence, among other issues.[2] [*See, e.g.*, Dkt. 131, ¶¶1, 12, 14–15, 25.]

The Court agrees that numerous aspects of Gaines's submissions fail to comply with the Local Rule. In recounting the material facts and in the analysis below, the Court notes what evidence it has relied upon in making its decision, which facts are deemed admitted or properly disputed, and what evidence has been disregarded. *See Howard v. Cook Cnty. Sheriff's Off.*, 2022 WL 1404833, at *3 (N.D. Ill. May 4, 2022); *see also Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884 (7th Cir. 2012) (where a party has failed to create a genuine dispute, the fact is deemed admitted).

## II.    Background

The Court presents the following facts in the light most favorable to Gaines. *Emad v. Dodge Cty.*, 71 F.4th 649, 650 (7th Cir. 2023).

Cook County Sheriff's Office's ("CCSO") Community Corrections Division is comprised of three departments, one of which is the Electronic Monitoring ("EM") Unit. [Dkt. 117, ¶4.][3] The EM Unit monitors EM participants—*i.e.*, individuals on

---

[2]    Defendants say that many of Gaines's asserted facts in his Local Rule 56.1(b)(3) statement of additional facts do not comport with the "short numbered paragraph" requirement. [Dkt. 132 at 6.] Local Rule 56.1(b)(3) requires "concise numbered paragraphs." Many of Gaines's paragraphs assert multiple, unrelated facts per paragraph, and the Court would be well within its discretion to strictly enforce the Local Rule. It elects against doing so, however, in line with the preference against deciding cases on technicalities.

[3]    Gaines moves to strike an affidavit from Maria Oviedo ("Oviedo"), a CCSO custodian, [Dkt. 110-8], because she "was never disclosed as a witness on Defendants' Rule 26 disclosures." [Dkt. 121 at 12.] The objection is overruled. Although Oviedo was not disclosed by name, Defendants properly disclosed in their Rule 26(a)(1) disclosures that a record keeper would be called to lay foundation for any records it produced. [Dkts. 117-2 at 2 (initial disclosures); 117-26 at 2 (stating in their amended disclosures that Defendants will call any

release from the Department of Corrections—while they await trial. [*Id.*] At the time of the events giving rise to this lawsuit, Gaines was 69 years old and served as Assistant Chief in the EM Unit. [*Id.*, ¶¶1, 4.]

In May 2019, Gaines reported to Ruffin, who was the Director of the Community Corrections Division. [*Id.*, ¶¶3, 6.] Ruffin was later promoted to Executive Director in February 2021; in both capacities, she oversaw the EM Unit. [*Id.*] Ruffin reported to Adriana Morales, CCSO's Chief of Intergovernmental Affairs. [*Id.*, ¶¶5–6.] Sheriff Dart is the elected Sheriff of Cook County. [*Id.*, ¶2.]

### A. Gaines's Employment and Interactions with Ruffin

As an Assistant Chief, Gaines provided oversight, support, and backup to subordinate officers in the field, meeting with them and checking on their assignments. [*Id.*, ¶13.] He was responsible for completing daily reports—including a supervisor log—detailing his activities in the field and signing off on subordinates' activity reports. [*Id.*, ¶¶13, 16.] Gaines sent his daily reports to an employee in the EM Unit, who forwarded them to Morales daily. [*Id.*, ¶16.] In addition, like all other EM Unit employees, Gaines was required to state his location on the radio system while in the field, including when he was en route to a location, when a job was completed, and during interactions with EM Unit staff or participants. [*Id.*, ¶14.]

---

record keeper needed to lay foundation for any records "includ[ing] records with information regarding time records, discipline records, personnel records, and other work-related records relevant to Plaintiff and events alleged in this complaint.").] The failure to fully identify Oviedo by name would not warrant exclusion of her affidavit in any event because "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Gaines contends that within the first week of her arrival at the CCSO in May 2019, Ruffin began making age-related comments. [Dkts. 110-1 at 21–22; 117, ¶62.] According to Gaines, Ruffin asked about his prior employment with the Chicago Police Department; mentioned that she knew Gaines was retired; questioned why he was still working when he had a pension; and expressed her desire to "build her own team" and "promote younger people." [Dkts. 110-1 at 21, 29, 32; 117, ¶62; 131, ¶1.][4] According to Gaines, he had similar conversations with Ruffin on at least four or five other occasions. [Dkt. 117, ¶62.]

During a second conversation, Gaines maintains that he recommended certain senior Investigators—David Walker ("Walker"), Marcus Jackson ("Jackson"), Rotonda Malone-Cole ("Malone-Cole"), Robert Brown ("Brown") and Fernando Clark ("Clark")—for promotion or training, and Ruffin responded by expressing doubt about how long these Investigators "would be around," which Gaines "took to be a reference to their age or proximity to retirement." [Dkts. 110-1 at 29–30, 33; 117, ¶63; 131, ¶2.] Gaines recounts a third age-related remark made during a roll call meeting. [Dkts. 110-1 at 34; 117, ¶64; 131, ¶3.] In response to an older officer's question, Gaines contends that Ruffin told that officer that she (Ruffin) had accomplished more for the EM Unit in her last three months than the officer had in the past twenty-four or

---

[4]     Gaines's Local Rule 56.1(b)(3) statement of additional facts at ¶1 misleadingly refers to statements Ruffin made during this conversation in May 2019 as if they occurred during the August 13, 2019 conversation between Ruffin and Gaines described in more detail below. *Compare* 117, ¶62 (May 2019 conversation), *with* Dkt. 110-1 at 22–23 (August 13, 2019 conversation). The Court assumes this was unintentional.

twenty-five years. [Dkts. 110-1 at 34; 117, ¶64; 131, ¶3.] Defendants deny that Ruffin expressed any age-based animosity. [Dkts. 117-15 at 31, 42; 131, ¶¶1–3.]

The EM Unit uses a computer software program known as Protocol to maintain information and documents on EM participants. [Dkts. 117, ¶¶7–9; 125 at 2–3.][5] The parties dispute the significance of Protocol to daily operations, but these disputes are immaterial. There is no dispute that Ruffin criticized Gaines's work performance, including his failure to use Protocol and his failure to complete supervisor logs, among other things. [Dkts. 117, ¶19; 110-3 at 52.] Gaines admits he had "some knowledge" of how to use Protocol but that he used it only as needed. [Dkts. 117, ¶12; 110-1 at 25.] He also disputes whether Ruffin monitored his daily log activity in 2019.

On August 7, 2019, Ruffin sent Gaines an email about his job performance that summarized a conversation the two had earlier in the day. [Dkts. 117, ¶19; Dkt. 110-1 at 110.] In the email, Ruffin stated: "[w]hen you work in the field it is your responsibility to ensure the Investigators are completing their assignments in a timely manner . . . . It is not acceptable to ride around in areas as you have stated without communication with anyone in EM for hours on end." [*Id.*] The email also discussed the use and importance of Protocol and that Ruffin had arranged some training sessions so Gaines could "become proficient" with it. [*Id.*]

Events triggering a misconduct investigation into Gaines occurred on August 13, 2019. That day, Gaines signed in to work at 7:45 a.m., but Ruffin did not see or

---

[5]     Gaines's responses to the facts asserted in paragraphs 7, 8 and 9 of Defendants' Local Rule 56.1(b)(2) statement of facts (Dkt. 117) are a prime example of his failure to properly dispute an asserted fact, thus deeming the facts admitted.

hear from him that morning. [Dkt. 117, ¶20.] Ruffin asked Lt. Lasharme Collins ("Collins"), who shared an office with Gaines, Gaines's whereabouts, and Collins stated she believed Gaines was in the field. [*Id.*, ¶21.] At Ruffin's request, Collins contacted Gaines by radio, but received no response. [*Id.*, ¶22.] A few minutes later, Collins reached Gaines by phone. He stated he was on his way back to the office. [*Id.*]

Once Gaines arrived back to the office, he spoke with Collins and later Ruffin about where he had been. [*See id.*, ¶¶22–25.] The parties dispute what Gaines said, so to the extent there is a material dispute, for summary judgment purposes, the Court accepts Gaines's account that he told both women he was "pick[ing] up medical records that were requested by the CCSO" from his doctor's office related to an on-duty injury he suffered, and that he "was available for his men if they needed him." [*Id.*, ¶¶ 24, 25; 110-1 at 23, 26.]

While there is no dispute that Ruffin admonished Gaines for not following procedure and reminded him of their previous discussion, [Dkt. 117, ¶25], Gaines asserts that Ruffin made another age-related comment during the conversation. According to Gaines, Ruffin said Gaines was "old enough to know better than to take care of personal business on company time." [Dkts. 110-1 at 26, 27; *see* 131, ¶1.] Later that afternoon, Gaines submitted a request for two hours of sick time to account for "the time he was away that morning"; Ruffin denied the request. [Dkt. 117, ¶28.] Later, Ruffin spoke with Morales about how to handle the situation, and Morales directed Ruffin to report her concerns to the Office of Professional Review ("OPR").

[*Id.*, ¶30; Dkt. 131, ¶24.] The following day, August 14, 2019, Ruffin submitted a Complaint Register ("CR") to OPR. [Dkts. 117, ¶31; 131, ¶8.]

Sometime after this conversation, Gaines was placed on injury-on-duty status because of an injury on the job. [*See* Dkt. 117, ¶38; Dkt. 20, ¶¶20–21.]

### B.    OPR Investigation and Gaines's Termination

OPR is responsible for investigating allegations of significant misconduct by CCSO employees. [Dkt. 117, ¶32.] OPR investigators review CRs, arrange witness interviews, and gather documents. [*Id.*, ¶¶ 33, 34.] At the investigation's conclusion, the investigator determines whether there is sufficient evidence of a violation of CCSO policy and the findings are presented to an OPR supervisor in the form of a summary report. [*Id.*, ¶34.] The findings are next subject to "Command Channel Review," a process that allows CCSO's Chiefs and Executive Directors to evaluate OPR's factual findings and determinations, and decide if disciplinary action is warranted. [*Id.*, ¶35.]

Eyman Zabadneh ("Zabadneh") was assigned to investigate the CR filed against Gaines, which accused him of time and attendance fraud. [*Id.*, ¶36.] As part of his investigation, Zabadneh interviewed several employees including Ruffin, Collins, EM Unit Investigators Daniel Folkner ("Folkner") and Richard Messina ("Messina"), and Deputy Chief Cedric Logan ("Logan"). [*Id.*, ¶37; Dkt. 131, ¶17.]

Around the same time Ruffin filed the CR, she asked CCSO's Chief Information Officer to retrieve information about Gaines's computer activity and GPS location data for Gaines's work vehicle between May 31 and August 29, 2019. [Dkt. 117, ¶40.] In response, Ruffin received "proxy logs" of computer activity between August 13 and

16, 2019. [*Id.*, ¶41.] According to Defendants, these records showed that on the relevant dates Gaines never logged into the Protocol system and he visited websites apparently unrelated to CCSO business. [*Id.*] Upon receiving the requested GPS vehicle location records in early September, Ruffin forwarded them to Zabadneh. [*Id.*, ¶42.]

In addition to this material, Zabadneh also reviewed the CR itself, Ruffin's August 7, 2019 email to Gaines, Gaines's August 13 request for sick hours, Gaines's medical leave requests and requests for time off, his supervisor logs and daily activity reports, and certain evidence and equipment logs. [*Id.*, ¶45.] According to Gaines, Zabadneh could not recall the extent to which he investigated Gaines's August 13 trip to the doctor's office in part due to HIPPA concerns, and Zabadneh could not recall whether he investigated "how breaks worked" in the EM Unit or whether Gaines "was on a break during the time he stopped at the doctor's office." [Dkt. 131, ¶¶11–12.]

There is no dispute that Zabadneh reviewed the GPS records to track Gaines's whereabouts, cross-referencing the addresses listed in the GPS records with addresses listed on Gaines's daily activity report. [Dkt. 117, ¶43.] Based on his review, Zabadneh concluded that many of the locations listed in the GPS records did not align with the locations of EM participants. [*Id.*] At least one GPS coordinate for one of the days placed Gaines near a large body of water. [*Id.*, ¶42.]

On September 19, 2019, Zabadneh provided Gaines with written notice of the investigation and later spoke with Gaines to schedule an interview, but on the day of that interview, Gaines was a no-show. [*Id.*] Zabadneh tried unsuccessfully to reach

Gaines twice more by phone, but received no response. [*Id.*, ¶38, 39.] At his deposition in this litigation, Gaines admitted to being near his marina property while on duty, and near a vacant lot adjacent to his property or near his home on various dates in July and August 2019. [*Id.*, ¶44.]

In September 2020, Zabadneh prepared a summary report of the investigation, which concluded that on August 13, 2019, Gaines visited a doctor's office during working hours without permission using a CCSO vehicle. [*Id.*, ¶46; Dkt. 110-3 at 107.] The report also concluded Gaines maintained a boathouse he visited along with several other boathouses on at least five different occasions during workdays. [Dkts. 117, ¶47; 110-3 at 107.] The report stated, "Gaines took advantage of his trusted official position as a supervisor and used it to conduct personal business during his shift, leaving investigators unsupervised on more than one occasion." [Dkt. 110-3 at 107.] It also noted Gaines was "due to retire in November 2019." [Dkt. 117, ¶65.]

In January 2021, OPR sustained the findings that Gaines engaged in job abandonment, unsatisfactory job performance, failure to provide leadership, and conduct unbecoming. [*Id.*, ¶¶48–49; Dkt. 110-3 at 107–08 (CCSO Policy No. 101 and Merit Board Rules and Regulations Article X, CCSO Policy No. 101.5.1, CCSO Policy No. 101.5.5, and CCSO Policy No. 101.5.7).] OPR's Director and its Executive Director signed off on these findings. [Dkt. 117, ¶50.]

On February 1, 2021, Morales performed a Command Channel Review of the investigation. [*Id.*, ¶51.] Morales was trained on such reviews and had evaluated between 50 and 100 OPR investigative reports since 2017. [*Id.*, ¶52.] After reviewing

OPR's investigative file, Morales agreed with OPR's findings and concluded termination was appropriate. [*Id.,* ¶54; Dkt. 131*,* ¶22.] Morales forwarded her determination to human resources. Gaines was terminated on March 12, 2021. [Dkt. 117*,* ¶¶1, 54–55.]

## III. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.*" Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Birch Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted).

## IV. Analysis[6]

In his Second Amended Complaint, Gaines brings a § 1983 equal protection claim against Ruffin in her individual capacity (Count I). [Dkt. 20 at 9–11.] He also

---

[6]     The Court (again) rejects Defendants' argument that Gaines's ADEA and IHRA claims must be dismissed for failure to exhaust administrative remedies. [Dkt. 109 at 11–12.] Defendants raised this argument at the motion to dismiss stage, and the Court rejected it. [Dkt. 40.] Gaines filed his original complaint and his charges with the EEOC on the same day, September 30, 2021, [*see* Dkts. 1; 1-1; 1-2], but Defendants affirmatively requested a stay for sixty days, which the Court granted "while administrative prerequisites played out." [Dkts. 8 and 40 at 2 (explaining that a stay "is a permissible way to proceed" (citing *Palka v. City of Chi.*, 662 F.3d 428, 438 (7th Cir. 2011)).] Gaines exhausted his administrative remedies, moved to lift the stay, and then filed his Second Amended Complaint. [Dkt. 20.]

alleges that the CCSO terminated him in violation of the ADEA and the IHRA (Counts II and III). [*Id.* at 11–17.] Finally, he brings an indemnification claim against Cook County. (Count VI). [*Id.* at 17–18.]

### A. Count I: Section 1983 Equal Protection Claim

The Court first addresses Count I, Gaines's § 1983 claim that Ruffin discriminated against him based on age in violation of the Equal Protection Clause of the Fourteenth Amendment. [*Id.* at 11–14.] "The ADEA is not the exclusive remedy for age discrimination in employment claims in our circuit. Section 1983, which authorizes suits against state and local officials who violate federally protected civil rights, also provides a civil remedy for age discrimination when, as here, a plaintiff alleges age discrimination under the Equal Protection Clause of the Fourteenth Amendment." *Reinebold v. Bruce*, 18 F.4th 922, 925 (7th Cir. 2021) (citing *Levin v. Madigan*, 692 F.3d 607, 621–22 (7th Cir. 2012)).

The Fourteenth Amendment subjects age-based distinctions to rational basis review. To prevail, a plaintiff must prove "(1) the defendant intentionally treated him differently from others similarly situated, (2) the defendant intentionally treated him differently because of his membership in the class to which he belonged, and (3) the difference in treatment was not rationally related to a legitimate state interest." *Reinebold*, 18 F.4th at 925.

To advance a § 1983 equal protection claim against a government employee in her individual capacity, a plaintiff must prove that the employee "caused or participated" in the allegedly constitutional deprivation in some way. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012). The standard for analyzing a § 1983 claim

at summary judgment requires the Court to determine "whether the evidence would permit a reasonable factfinder to conclude that . . . discrimination [based on age] caused the adverse employment action," here, termination. *Barnes v. Bd. of Trs. of Univ. of Ill.*, 946 F.3d 384, 389 (7th Cir. 2020).

### 1. Proximate Cause

Gaines invokes a cat's paw theory of liability. [Dkt. 121 at 11 ("Gaines files this suit because his termination was a phony excuse to terminate him due to his age, Ruffin orchestrated the entire termination, and she was Morales['s] cat's paw and got what she wanted by getting Gaines fired so she could accomplish her goal of moving younger officers up.").] The Seventh Circuit has recognized "a cat's paw theory would support imposing individual liability under § 1983 on subordinate government employees who act with unlawful motives to cause the actual decision-makers to take action against another employee." *Taylor v. Ways*, 999 F.3d 478, 488-89 (7th Cir. 2021) (citing *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)). A cat's paw theory is "invoked in employment discrimination contexts when a biased supervisor, or a biased subordinate, 'who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) (citations omitted). To show age-based discrimination under the theory, a plaintiff "must present evidence that 'the biased subordinate actually harbored discriminatory animus' against him and that the subordinate's scheme proximately caused the adverse employment action." *Id.* at 574.

A biased supervisor may still proximately cause the adverse employment action if the ultimate decisionmaker's independent investigation takes the supervisor's report "into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified" or if the investigation "relies on facts provided by the biased supervisor." *Id.* (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 415 (2011)). The decisionmaker need not be "a paragon of independence." *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019). An employer avoids cat's-paw liability if "the decisionmaker is not wholly dependent on a single source of information and conducts her own investigation into the facts relevant to the decision." *Id.* So long as "the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . the employer will not be liable." *Staub*, 562 U.S. at 421.

Gaines maintains that Ruffin was a biased supervisor who exercised a controlling influence on Zabadneh and later Morales, the ultimate decisionmaker, resulting in his termination. Gaines argues that Ruffin harbored discriminatory age animus and "orchestrated [Gaines's] entire termination" by filing the CR, which led to a tainted OPR investigation by Zabadneh. [Dkt. 121 at 11, 14–18, 20–22.] Then, according to Gaines, Morales performed "a perfunctory review" of OPR's findings, and decided to terminate Gaines. [*Id.* at 22–23.]

Defendants maintain that even if Ruffin had a discriminatory motive, "there is no evidence that OPR relied on the veracity of Ruffin's complaint for anything but initiating the investigation." [Dkt. 132 at 12.] They argue that OPR "followed its

14

normal process in investigating the CR against Gaines," and that Morales "independently conducted Command Channel Review" before determining that Gaines's conduct warranted termination. [*Id.*; Dkt. 109 at 19.]

The Court need not decide whether Gaines could show Ruffin actually possessed age-based animus,[7] because Gaines has failed to come forward with sufficient evidence that Ruffin proximately caused the termination. First, "[t]he mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 462 (7th Cir. 2021). If the decision to terminate Gaines "did not rely on the credibility of a biased supervisor—that is, the employer believed it had independently sufficient reasons, such as corroboration of the allegations, to take the adverse action," then the cat's paw theory fails. *Id.*

Here, the investigation leading to Gaines's termination did not rely solely on facts provided by Ruffin, and no reasonable factfinder could conclude otherwise. For example, Gaines does not dispute that in addition to Ruffin, Zabadneh interviewed four other employees including Collins, Folkner, Messina, and Logan. [Dkt. 117, ¶37.] Zabadneh also reviewed GPS vehicle location records between July 10 and August 28, 2019, and cross-referenced that location information with addresses listed on Gaines's daily activity report. From this, Zabadneh concluded that many of the listed locations for Gaines's CCSO vehicle did not match the locations of EM participants.

---

[7]     *Sinha*, 995 F.3d at 574 ("Because the cat's paw theory requires a showing of both discriminatory animus and proximate causation, we need not address both prongs if the employee makes an insufficient showing on one.").

[Dkts. 117, ¶43; 110-3 at 103–04 (Zabadneh describing how he "examined and compared historical GPS tracking, supervisor logs and daily activity report forms on various dates when [ ] Gaines was on duty" based on his vehicle's unit number and that "specific locations where [the vehicle] was stopped were reviewed on Google Maps.").] This evidence establishes that Zabadneh "drew a conclusion independent of" any alleged influence by Ruffin. *Sinha*, 995 F.3d at 575 (employee could not demonstrate proximate cause under cat's paw theory of liability when ultimate decision-maker drew his own conclusion after conducting an investigation, even though biased supervisor was among those interviewed).

Gaines's arguments to the contrary are unconvincing. He argues that the OPR investigation was not independent because Ruffin "pointed Zabadneh in the direction of obtaining GPS records" and she "gave Zabadneh the Daily Activity Reports" for use in the investigation. [*Id.*; Dkt. 117-16 at 14.][8] He also argues that Zabadneh "never investigated how breaks worked in the Unit, never learned whether Gaines was on a break during any stop at a doctor's office," and "did nothing" to investigate the nature of Gaines's[s] stop at [his] doctor's office." [Dkt. 121 at 21–22.]

---

[8]     Regarding Zabadneh's deposition testimony, Gaines's responses to Defendants' statements of facts come uncomfortably close to a misrepresentation of that testimony. [Dkts. 117, ¶¶42–44, 47–49, 54–55; 121 at 2; 131, ¶15 (stating that "Zabadneh admitted that the GPS records do not show that Gaines was somewhere he was not supposed to be."). When asked if the GPS record "in and of themselves" show that Gaines was not performing his job at "any time" or "somewhere he wasn't supposed to be," Zabadneh responded, "I mean, not–not at first hand, because there's a lot of stops." [Dkt. 110-10 at 14.] Zabadneh explained that determining whether Gaines was outside of the assigned patrolling area while on duty required more than simply looking at the GPS records "in and of themselves"—he cross referenced the address listed in the GPS records "to the daily activity reports where they had a . . . list of address[es] for the EM participants." [*Id.* at 28.]

First, the Court has already explained why Ruffin's initiation of the CR alone cannot establish liability under a cat's paw theory. *Vesey*, 999 F.3d at 462 (even if plaintiff's manager had a retaliatory motive and initiated the investigation leading to the termination, investigators "reached their conclusion by reviewing Vesey's travel history and activity on various airline systems and by interviewing her" and another employee). Second, although he identifies steps Zabadneh did not take during the investigation, the question here is not whether Zabadneh pursued every possible avenue before concluding that Gaines violated CCSO policy. The question is whether *Morales* "rendered an independent decision" to terminate Gaines "that did not singularly or wholly depend" on Ruffin. *Sinha*, 995 F.3d at 575.

The record establishes she did. Gaines does not dispute that Command Channel Review only allowed Morales to "evaluate OPR's factual findings and policy determinations, concur or not concur with OPR's findings and determine if there is cause to administer discipline." [Dkts. 117, ¶35; 131, ¶¶ 20–21.] Morales testified that based on her review of OPR's findings, Gaines's conduct warranted termination because he handled personal business in his CCSO vehicle, failed to supervise staff, and visited boat docks during work hours, among other things. [Dkt. 117, ¶55; Dkt. 110-6 at 7 ("After reviewing the investigation and the charges against Gaines. . . I thought it warranted termination." During work hours, Gaines "was taking care of his personal business" "in a County issued vehicle and as a result failed to supervise staff.").] Morales also testified that she reached this conclusion without consulting Ruffin or anyone else, a fact Gaines does not meaningfully dispute. [Dkt. 117, ¶ 56

(not disputing the point other than by stating Morales "spoke to Ruffin about the situation *before* doing the Command Channel Review." [Dkt. 117, ¶56 (emphasis added); Dkt. 110–6 at 16 ("Q. Did you ever have any conversations with Carmen Ruffin after she submitted her OPR complaint against Gaines about the—about her complaint registered to OPR about Gaines?" "A. No."; "Q. Did you ever have any conversations with any investigators at OPR about the Gaines investigation?" "A. No."; "Q. Was there anybody else involved in Command Channel Review of this file with you or was it just you?" "A.: It would have just been me."; "Q. Did you consult with anyone at all about what level of discipline to select in this instance?" "A. No.")]

Gaines asserts that Morales did not "meaningfully review the OPR file," failed to interview Gaines, and did not otherwise conduct "any investigation whatsoever." [Dkt. 131, ¶¶ 20–21.] But he does not dispute that Morales followed Command Channel Review protocol, which entailed an independent review and evaluation of Zabadneh's investigation. Nor was Morales required to be a "paragon" of independence. *McDaniel*, 940 F.3d at 370. Given the layers of review and the nature of that review, no fact finder could reasonably conclude that Morales was singularly influenced by Ruffin such that Ruffin was the proximate cause of Gaines's termination. *Watkins v. City of Chicago*, 2023 WL 155450, at *2 (7th Cir. Jan. 11, 2023) (layers of review by different officials establishes the investigation "was not an exercise in rubber-stamping"); *Martino v. MCI Comms. Servs., Inc.*, 574 F.3d 447, 453 (7th Cir. 2009) (cat's paw theory fails "even if the court assumes the defendant was prejudiced because there were not one but *two* layers of bias-free analysis") (emphasis

in original) (cleaned up)). In sum, Gaines has not met his burden of showing that age animus proximately caused his termination.

### 2.    Similarly Situated Comparator

Gaines § 1983 equal protection claim fails for a second reason: he has not identified a suitable comparator. "To show he was intentionally treated less favorably than others similarly situated, [Gaines] must introduce evidence of similarly situated comparators." *Reinebold*, 18 F.4th at 925. "To be similarly situated, comparators must be prima facie identical in all relevant respects." *Id.* (cleaned up). The similarly situated analysis is not a precise formula, *see LaBella Winnetka, Inc. v. Vill. of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010), but a plaintiff "must show that he was a member of a protected class and that he was treated differently from a similarly situated member of an *unprotected* class." *See Alston v. City of Madison*, 853 F.3d 901, 906 (7th Cir. 2017) (emphasis added) (plaintiff must come forward with evidence showing "similarly situated employees who were not members of her protected class were treated more favorably.").

Here, Gaines says that senior EM Unit investigators Walker, Jackson, Brown, Clark, Malone-Cole, and Logan are suitable comparators because "[t]hey all worked in EM, reported to Ruffin, and were subject to the same standard." [Dkt. 121 at 20.] But none of these employees are a suitable point of comparison because they all were older than forty.[9] [*See e.g.*, Dkts. 117, ¶¶70–72, 74–75, 77; 131, ¶¶27–28.] Because Gaines has not met his burden as to this element of the *prima facie* case of

---

[9]    To the extent Gaines intended to rely on Collins or Gerald Hill as similarly situated comparators, they are also over age 40. [Dkt. 117, ¶¶66–67.]

discrimination, summary judgment is appropriate for this reason, too. *See Carson v. Lake County*, 865 F.3d 526, 536–37 (7th Cir. 2017) (stating that plaintiff's equal protection claim fails because no suitable comparator was identified).

### B.     Counts II and III: ADEA and IHRA Claims

The Court next turns to Gaines's ADEA and IHRA claims. [Dkt. 20 at 11–17.] The ADEA protects workers 40 years and older from age-based employment discrimination. 29 U.S.C. § 623(a)(1). The ADEA provides that it is unlawful for an employer to "discharge . . . or [ ] discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Id.* § 623(a)(1). Gaines will survive summary judgment if "the evidence would permit a reasonable factfinder to conclude that [his age] caused the discharge or other adverse employment action." *Brooks v. Avancez*, 39 F.4th 424, 433 (7th Cir. 2022) (citation omitted). However, "in the ADEA context, it's not enough to show that age was a motivating factor. The plaintiff must prove that, but for his age, the adverse action would not have occurred." *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020).

Like the ADEA, the IHRA bars employers from acting "with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination." 775 ILCS 5/2-102(A); *see also De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (noting that courts "evaluating claims of discrimination" brought under the IHRA "apply the same"

methods used "by federal courts in evaluating causes of action brought pursuant to" the ADEA).

An ADEA plaintiff may either "prove discrimination in a holistic fashion,"[10] under *Ortiz*, or rely on the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting framework, which gives the plaintiff the initial burden to establish a prima facie case of discrimination, after which "'the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.'" *Tyburski*, 964 F.3d at 598 (citation omitted). Because the parties refer to both methods, the Court does the same. Under either approach, the Court asks whether, looking at the record as a whole, "a reasonable jury could conclude that the plaintiff suffered the adverse employment action because of his membership in a protected class." *Ortiz*, 834 F.3d at 764–65.

### 1. *McDonnell Douglas*

To establish a *prima facie* case under the *McDonnell Douglas* framework, Gaines must show that: (1) he is a member of a protected class, (2) his job performance met CCSO's legitimate expectations, (3) he suffered an adverse employment action, and (4) other similarly situated individuals who were not members of a protected class received more favorable treatment compared to him. *See McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Carson*, 865 F.3d at 533. If Gaines can establish a

---

[10] Both parties refer to a "convincing mosaic" of discrimination, [*see* Dkts. 109 at 13; 121 at 12], but the Seventh Circuit has long since rejected "convincing mosaic" as a legal test. *Ortiz*, 834 F.3d at 765.

*prima facie* case, the burden shifts to Defendants to articulate a legitimate, non-discriminatory reason for the adverse employment actions it took, which Gaines may then attack as pretext. *McDonnell Douglas*, 411 U.S. at 802; *Carson*, 865 F.3d at 533.

Gaines's *prima facie* case fails for the reasons already discussed. Although there is no dispute that Gaines belongs to a protected class and that he suffered an adverse employment action in the form of termination,[11] he has not identified a similarly situated individual outside of his protected class who received more favorable treatment than him. In his response brief, Gaines points to affidavits from "other older former officers [ ] in the EM Unit," including Walker, Jackson, Brown, Clark, Malone-Cole, and Logan, who confirm Ruffin's "age-based preferences for younger officers." [Dkt. 121 at 20.] But all of these employees are over forty, and Gaines has failed to identify anyone under forty who Ruffin treated more favorably as compared to Gaines. [Dkts. 117, ¶¶ 66–67, 70–72, 74–75, 77; 131, ¶¶27–28.] Therefore, the age discrimination claim falters under a *McDonnell-Douglas* analysis.

### 2. *Ortiz*

Under *Ortiz*, the Court takes a holistic approach to the evidence and asks simply "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] . . . caused the discharge or other adverse employment action" at issue. 834 F.3d at 765; *see also Lewis v. Indiana*

---

[11]     The parties dispute whether Gaines was meeting legitimate job expectations. The Court "may skip the *McDonnell Douglas* prima facie analysis if the employer raises the employee's performance as the reason for the adverse employment decision." *Vichio v. U.S. Foods, Inc.*, 88 F.4th 687, 692 (7th Cir. 2023) (citing *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023)). In that circumstance, "issues of satisfactory performance and pretext overlap, allowing us to 'proceed directly to . . . pretext.'" *Id.*

*Wesleyan Univ.*, 36 F.4th 755, 760 (7th Cir. 2022) (the court assesses the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself). In making this determination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz*, 834 F.3d at 766.

There are "three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll v. Valparaiso Community Schools*, 953 F.3d 923, 929 (7th Cir. 2020). If, taken together, this "evidence would permit a reasonable jury to infer an overall likelihood of discrimination," summary judgment must be denied. *Id.*[12]

Gaines argues a few varieties of pretext including Ruffin's age-based comments, a pattern of targeting older workers, and suspicious timing. [Dkt. 121 at 14–19.] He also argues that the OPR report's reference to his expected retirement date is evidence from which a jury could conclude that his age caused his termination. *Id.* Even with the benefit of all reasonable factual inferences, there is insufficient evidence from which to infer "an overall likelihood of discrimination." *Ortiz*, 834 F.3d at 763.

### a.    Remarks by Ruffin

First, Gaines points to several remarks by Ruffin made between her arrival in May 2019 and the events of August 13, 2019 that evidence an age bias. Specifically,

---

[12]    To the extent Gaines re-raises a cat's paw theory of liability for his ADEA and IHRA claims (Dkt. 121 at 20–23), this argument fails for the reasons already discussed.

during a conversation in May 2019, Ruffin asked Gaines about his retirement, why he was still working when he had a pension from the police department, and said that her agenda was to "promote younger people." [Dkts. 110-1 at 21–22, 29, 32; 117, ¶62; *see also* 131, ¶1.] In another conversation, Ruffin said she did not know how much longer certain officers would be around, which Gaines "took to be a reference to their age or proximity to retirement." [Dkt. 131, ¶2.] In a third example, during a roll call meeting, Ruffin told another officer that Ruffin "had done more in the Unit in three months than that officer had done in 24 or 25 years of experience." [*Id.*, ¶3.] Finally, Gaines points to comments Ruffin made during the August 13, 2019 meeting in which Ruffin referenced Gaines's age stating, "You're old enough to know better." [Dkts. 110-1 at 22–23; *see* 131, ¶1.] "[R]emarks can raise an inference of discrimination if they are made by a person with decision-making power over the adverse employment action at issue and are made around the same time and in reference to that decision." *Brooks*, 39 F.4th at 439; *Teruggi v. CIT Grp./Cap. Fin., Inc.*, 709 F.3d 654, 661 (7th Cir. 2013).

Here, all of the comments Gaines identifies were made by his supervisor, Ruffin, but she was not the relevant decision-maker. Morales was. Nor has Gaines demonstrated how any age-related comment by Ruffin made to him or his co-workers was made around the same time as the decision to terminate.[13] Ruffin's comment during the August 13, 2019 meeting that Gaines was "old enough to know better" was made close in time to Ruffin filing the CR, but it was not close in time or in reference

---

[13]     This is an especially problematic given Gaines's medical leave beginning in the fall of 2019 through 2021.

to his termination in 2021. Nor has Gaines presented evidence on how any remark he identifies had anything to do with *his* termination. *Brooks*, 39 F.4th at 439. Because he has not put forth evidence showing how Ruffin's age-related comments related to the decision to terminate him, his efforts to show pretext fall short. *Martino*, 573 F.3d at 452 (plaintiff "focuses on [a supervisor's] 'oldtimer' comments, but because [that supervisor] was not a decisionmaker, these comments are only relevant if [the supervisor] had singular influence over the decisionmaker . . . and used that influence to cause the adverse employment action." (cleaned up)). *Choy v. Chicago Park Dist.*, 2022 WL 874648, *6 (N.D. Ill. Mar. 24, 2022) (remarks by plaintiff's supervisor who asked another employee about retirement plans failed to support an inference of discrimination because supervisor was not the relevant decisionmaker nor were the statements connected to the adverse employment action).

### b. Treatment of Others

Next, Gaines argues that a jury could find in his favor in part because of Ruffin's treatment of other older EM Unit staff members over age 40—Walker, Jackson, Malone-Cole, Brown, Clark, and Logan—all of whom aver that Ruffin targeted older staff for replacement by younger employees. [Dkts. 117-28–117-33.]

"[B]ehavior toward or comments directed at other employees in the protected group is one type of circumstantial evidence that can support an inference of discrimination." *Vega v. Chicago Park District*, 954 F.3d 996, 1005 (7th Cir. 2020) (quoting *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008)). When decisions are made by different decision-makers, the relevance of the evidence depends on "a variety of factors, including 'how closely related the evidence is to the

plaintiff's circumstances and theory of the case.'" *Id*. To survive summary judgment, Gaines must provide details that would allow a reasonable factfinder to infer a discriminatory reason for termination. *Gray v. Arrow Electronics, Inc.*, 2019 WL 1399945, at *3 (N.D. Ill. Mar. 28, 2019) (plaintiff's argument about three employees terminated by different decision-makers over the course of a year was not evidence from which a reasonable factfinder could infer a discriminatory reason for plaintiff's termination).

Gaines has failed to do so. For Walker, Jackson, Brown, Logan and Clark, Gaines has not come forward with any evidence that these employees were terminated—nor could he because they all retired. [Dkts. 117-28, ¶3; 117-29, ¶3, 117-31, ¶3; 117-32; ¶3.] 117-33, ¶3.] Gaines has identified one EM Unit employee who was terminated, Malone-Cole, but there is no evidence of a link between the relevant decisionmakers and the terminations. Malone-Cole was fired by Ruffin, not Morales. The record also contains no evidence that Ruffin's decision to terminate Malone-Cole was at all motivated by age. [Dkt. 117-30, ¶3 ("I worked with . . . Ruffin for three months before she terminated me in March 2020 at the age of 50, and I was not provided any reason for this termination.").] Because evidence of treatment of others is not "closely related" to the treatment of Gaines, it is, at most, only minimally relevant to Gaines's theory of intentional discrimination and insufficient to create a reasonable inference of pretext.

### c.    **Suspicious Timing**

Next, Gaines briefly argues that a jury could infer discriminatory intent based on suspicious timing, pointing to the fact that Ruffin initiated the OPR investigation

on August 14, 2019, the day after Ruffin told Gaines he was "old enough to know better." [Dkts. 110-1 at 22–23; 121 at 18–19; *see* 131, ¶1.]

"[S]uspicious timing will rarely be sufficient in and of itself to create a triable issue" for the "obvious" reason that "suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (cleaned up). "For an inference of causation to be drawn solely on the basis of a suspicious-timing argument," "the time period between the protected activity and the adverse action must be very close," usually "no more than a few days . . . between the protected activity *and the adverse action*." *Id*. at 966–67 (cleaned up) (collecting cases*)*; *Xiong v. Bd. of Regents of the Univ. of Wis. Sys*., 62 F.4th 350, 355 (7th Cir. 2023) (in a retaliation case, a factfinder could infer causation based suspicious timing where only one day passed between the protected activity and the termination).

Here, as discussed above, Morales's decision to terminate Gaines in 2021 is the adverse employment action at issue, not the initiation of an OPR investigation in 2019. This interval is simply too long to support a finding of suspicious timing. *Cf. Rozumalski v. W.F. Baird & Assocs., Ltd*., 937 F.3d 919, 926 (7th Cir. 2019); *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017) ("In some circumstances, suspicious timing [of an employee's termination] may reveal discriminatory intent."); *Kidwell*, 679 F.3d at 966 ("very close" typically means "no more than a few days.").

### d.    OPR References to Gaines's Retirement

Finally, Gaines argues that the OPR report's "reference to his age" is suspicious and supports a finding of pretext. [Dkt. 121 at 19.] Zabadneh's summary

report states that "Gaines was due to retire in November of 2019, [but] due to [an] alleged shoulder injury, he is currently on [Injured on Duty status] and receiving [ ] benefits." [Dkt. 110-1 at 101.] In Gaines's view, "[t]here is no discernible reason for this age-based statement to be in the OPR Report," which he says supports an inference of "age being considered" in his termination. [Dkt. 121 at 19.]

Gaines has offered little more than speculation that the report's reference to his retirement eligibility correlated with his age. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 721–22 (7th Cir. 2018) (refusing to "equate the hiring manager's comments about an employee's impending retirement with an inappropriate focus on age."). Viewed in a light most favorable to him, however, the reference to retirement at best constitutes a small amount of evidence that could support an inference of discrimination. It is not enough to sustain Gaines's claim on its own, but something to add to the pile. *See Ortiz*, 834 F.3d at 766.

\* \* \* \*

The Court has reviewed each strand of evidence regarding Gaines's termination. That evidence includes his cat's paw theory, Ruffin's age-based comments, her treatment of older EM Unit staff members, suspicious timing, and OPR's reference to Gaines's eligibility date for retirement. The Court must consider all evidence as a whole, "asking whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Ortiz*, 834 F.3d at 765). It does not. This scant evidence is insufficient to raise a genuine dispute of material fact— that "but for [Gaines's] age, the adverse action would not have occurred." *Tyburski*,

28

964 F.3d at 598. Even putting all the evidence in a pile, *see Ortiz*, 834 F.3d at 766, no reasonable jury could find in his favor. Defendants are entitled to summary judgment on the ADEA and IHRA claims.

### C. Count VI: Indemnification Claim

Because no underlying claims have survived summary judgment, it follows that Cook County is entitled to summary judgment on Count IV. *See Olson v. Champaign Cty., Ill.*, 784 F.3d 1093, 1104 (7th Cir. 2015).

## V. Conclusion

Defendants' motion for summary judgment [Dkt. 108] is granted.

Enter: 21-cv-5192
Date: July 2, 2024

_____
Lindsay C. Jenkins
United States District Judge